## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PEGGY CLAIRE FOLMAR, | CASE NO. 1:15-cv-00990-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| | Docs. 1, 8, 9, 10, 13 |
| Defendant. | |

## REPORT AND RECOMMENDATION

### I.    Procedural Background

On September 10 2012, and September 15 2012, Peggy Claire Folmar ("Plaintiff") filed as a claimant for disability benefits under Title XVI and Title II of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last insured of June 30, 2017,[1] and disability onset date of September 10, 2012. (Administrative Transcript (hereinafter, "Tr."), 64).

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on November 13, 2013.  (Tr. 113-148).  On December 2, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (Tr. 61-79).  Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on April 21, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-7).

On May 21, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits.  (Doc. 1).  On July 30, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 8, 9).  On September 10, 2015, the Court referred this case to the undersigned Magistrate Judge.  On September 11, 2015, Plaintiff filed a brief in support of the appeal. (Doc. 10) ("Pl. Brief")).  On October 16, 2015, Defendant filed a brief in response. (Doc. 13 ("Def. Brief")).

## II.     Relevant Facts in the Record
### A. Education, Age, and Vocational History

Plaintiff was born in September 1969 and classified by the Regulations as a younger individual at the time of the ALJ decision.   (Tr. 74); 20 C.F.R. § 404.1563(c).  Plaintiff reported having a difficult childhood which included being sexually molested by three different individuals as a child.  (Tr. 320).  She had

difficulty in school and left school after the 9th grade. (Tr. 121). Plaintiff never had a driver's license. (Tr. 320). From 1989 to 2001, in 2003, and in 2006, Plaintiff did not earn any quarter of coverage.[2] (Tr. 194). In 2002 and from 2007 through 2012, Plaintiff earned three to four quarters of coverage with the highest annual income of $8955.69. (Tr. 194). She testified that she was employed as a part-time hotel housekeeper when she stopped working in September 2012. (Tr. 121-22). She also testified that she worked as a caregiver for a few months at the end of 2012. (Tr. 124, 198). While Plaintiff testified that she lived in an apartment by herself (Tr. 120-21), she also acknowledged that she lived with her boyfriend and her boyfriend's uncle, who was like a roommate (Tr. 139-40).

### B. Relevant Treatment History and Medical Opinions

### 1.    Williamsport Regional Medical Center: Kendra Dolan, M.D.

On September 16, 2012, Plaintiff sought emergency treatment due to complaints of depression, suicidal thoughts, and anxiety. (Tr. 283). Dr. Dolan noted that Plaintiff had experienced situational problems due to a mentally abusive significant other. (Tr. 290). Plaintiff had been drinking earlier that night and injured her right ankle when she tried to jump over a bannister. (Tr. 283). When no one wanted to take her to the hospital, she began cutting her wrists. (Tr. 283).

---

[2] A quarter of coverage represents a minimum amount of taxable income based on a statutory formula that reflects the national average wage. *See Weidman v. Colvin*, No. CV 3:14-552, 2015 WL 5829788, at *11 n.4 (M.D. Pa. Sept. 30, 2015).

Plaintiff admitted to drinking a 6-pack of "tall" beers and two 20 ounce beers.  (Tr. 283).  She denied any previous attempts of self-injury.  (Tr. 283).  A functional assessment revealed no impairments.  (Tr. 283).  Other than a limited range of motion in the right ankle and superficial lacerations to the right forearm, right wrist, and left forearm, physical examination findings were normal.  (Tr. 284, 290-91).  She had a small avulsion fracture.  (Tr. 294).  Plaintiff denied experiencing any pain in the head, neck, or back.  (Tr. 312).  Plaintiff was assessed with a GAF score of 20.  (Tr. 302).

On November 15, 2012, Plaintiff was assessed with an anxiety reaction and spasms in the neck and upper back and was prescribed medication.  (Tr. 477).

On October 31, 2013, Plaintiff was assessed with cervical radiculopathy and prescribed medication.  (Tr. 380).  Upon discharge from emergency department treatment, in a form dated October 31, 2013, a  "hospital representative" with an illegible signature signed a recommendation for Plaintiff to limit lifting, not to engage in strenuous activity, and to rest.  (Tr. 484).  On November 3, 2013, Plaintiff sought treatment for neck pain and was prescribed medications.  (Tr. 485).

### 2.     Soldiers and Sailors Memorial Hospital (Laurel Behavioral Health): Clifford Weller, D.O.

On September 16, 2012, Plaintiff was transferred to Soldiers and Sailors Memorial Hospital and discharged on September 21, 2012, following a course of

individual, group, and milieu therapy.  (Tr. 327).  Upon admission, she reported stress due to the death of her brother from alcohol related issues three weeks earlier.  (Tr. 327).  Plaintiff reported that she had been treated for a number of years with psychotropic medication and had one session with a counselor about 15 years ago. (Tr. 327).  Upon admission, Dr. Weller observed that Plaintiff was alert and oriented; her grooming and hygiene were fair; she maintained reasonably good eye contact; there was no psychomotor disturbance; her speech was fluent without pressure or hesitation; her thoughts were logical and goal directed; her cognition and memory were intact; her insight and judgment were somewhat limited and immature; and she denied suicidal thoughts.  (Tr. 331).  Plaintiff described her mood as depressed while displaying congruent affect.  (Tr. 331). There was no evidence of mania or psychosis.  (Tr. 331).  She stated that her recent health had been "pretty good" except for her recent ankle injuries.  (Tr. 344).  Plaintiff reported that her leisure activities included playing with her grandchildren and going for walks. (Tr. 344).

Upon discharge, Dr. Weller noted that Plaintiff had never been on an antidepressant medication trial when she was not concurrently using alcohol.  (Tr. 327).  During the course of her hospitalization, minor evidence of alcohol withdrawal was noted.  (Tr. 328).  On the day of discharge, her mood was euthymic; there was no evidence of suicidal or homicidal thoughts; she had

rededicated herself to abstaining from alcohol; she had several good conversations with family; and she had no suicidal thoughts.  (Tr. 328).  Discharge diagnoses included depressive disorder not otherwise specified; alcohol intoxication, resolved; alcohol abuse, alcohol withdrawal syndrome, mild, resolved; and a GAF score of 50.  (Tr. 327).

### 3.  Lycoming-Clinton MR/MH

In an intake form dated September 19, 2012, it was noted that Plaintiff was appropriately dressed and well groomed.  (Tr. 319).  Plaintiff reported starting alcohol abuse when she was around fourteen or fifteen years old and cites anxiety as the reason why she never obtained a driver's license.  (Tr. 319).  It was noted that although Plaintiff had social anxiety, she did not appear to be agoraphobic.  (Tr. 319).  Plaintiff appeared depressed and anxious, she maintained good eye contact, was oriented, and conversed without difficulty.  (Tr. 320).  Plaintiff reported that she spent most of her time visiting with her children or going on social media.  (Tr. 320).  She was assessed with a GAF score of 45.  (Tr. 321).

### 4.  Susquehanna Community Health: Karen Peterman, N.P.

On September 7, 2012, it was noted that Plaintiff had not sought treatment with this provider for over a year.  (Tr. 355).  Plaintiff reported experiencing panic attacks which included one on the bus because she does not like to be in crowds.  (Tr. 355).  Plaintiff stated that she has been unable to keep a job over a year due to

absenteeism as a result of anxiety.  (Tr. 355).  Plaintiff reported that she drank alcohol only on a social basis.  (Tr. 355).  Upon examination, it was noted that her neck had a full range of motion, she was anxious, and continuously wringing her hands.  (Tr. 356).

On September 26, 2012, Plaintiff reported generalized anxiety.  (Tr. 353). Upon examination, Ms. Peterman noted that Plaintiff was appropriately groomed and in no apparent distress.  (Tr. 354).  Plaintiff was anxious, tearful, and she avoided eye contact and was continuously wringing her hands. (Tr. 354.  Her neck was supple with full range of motion.  (Tr. 354).

During follow-up visits on October 5, 2012 and October 31, 2012, she sought treatment for anxiety denied any history of substance abuse, reporting social alcohol use every three weeks.  (Tr. 352, 358).

On October 9, 2012, examination of Plaintiff's neck revealed normal findings and full range of motion.  (Tr. 544).

On November 20, 2012, Plaintiff reported continued neck pain which started the prior week, that the medication was not helping, and that the neck pain and spasms were causing her headaches and exacerbating her psychological symptoms. (Tr. 536).  Plaintiff had a disheveled appearance and her neck demonstrated a decreased range of motion with flexion, extension, and rotation in either direction. (Tr. 537).  Plaintiff was treated with injections and narcotics.  (Tr. 538).  On

January 24, 2013, examination revealed that Plaintiff had full range of motion in her neck.  (Tr. 531).

On October 24, 2013, Plaintiff reported muscle spasms in her neck with pain that radiated to her upper shoulder, lateral neck and head.  (Tr. 517).  It was noted that Plaintiff had decreased flexion, extension, rotation due to discomfort.  (Tr. 519).  Plaintiff was prescribed medication to address the muscle spasms.  (Tr. 519). In another record dated October 24, 2013, Ms. Peterman ordered imaging of Plaintiff's cervical spine in response to her report of neck pain over the past year which occurs usually on the left side with occasional numbness in her neck.  (Tr. 555).  Dr. Robert Francevinterpreted the imaging and concluded that it revealed "reversal of normal curvature and subluxations as well as mild anterior narrowing of the C5-C6 disc" and stated that "[t]hese changes are probably all secondary to paraspinal muscle spasm or splinting, though this is speculative."  (Tr. 555).

### 5.    White Deer Run/Cove Forge Behavioral Health System

On September 25, 2012, Plaintiff began treatment for chronic alcohol dependence and mental health issues.  (Tr. 383).  She had a GAF of 55.  (Tr. 383).

### 6.    Divine Providence Hospital: Michael J. Marceau, M.D.

On November 20, 2012, Plaintiff was admitted to the hospital for complaints of depression, anxiety, and thoughts of harm to her boyfriend.  (Tr. 413).  She reported a number of stressors: her boyfriend was verbally abusive, her cat had

cancer, and her brother had died four months earlier.  (Tr. 413).  Plaintiff reported

having "some problems with neck pain . . . for about the last week, associated with

her anxiety" and it was noted that she also "gets significant spasms in her upper

back, although this is associated with her anxiety."  (Tr. 416-17).  Plaintiff reported

that she was currently being treated for muscle spasms in her neck at Community

Health Center.   (Tr. 453).   A physical examination was essentially normal,

including full range of motion of the neck, good range of motion in the upper and

lower extremities, good muscle strength, good muscle mass bilaterally, normal

sensation and gait, and no visible resting tremors.  (Tr. 418).  Upon admission, Dr.

Marceau observed that Plaintiff was alert and oriented x3 (to person, place, and

time), her speech was at a normal rate and flow; she was fairly cooperative but "a

bit dramatic"; her affect was tearful, sad, and dysphoric; she described her mood as

depressed and anxious; her thought processes were coherent and goal directed; no

delusions were noted; she denied suicidal ideation but endorsed thoughts of

wanting to hurt her boyfriend who touched her inappropriately; her memory was

intact for 3/3 objects immediately and at five minutes; her cognition was "fairly

average" based on fund of knowledge; her judgment was intact to theoretical

constructs; and, her insight was fair.  (Tr. 449).

On November 27, 2012, Dr. Moreau completed a discharge summary.  (Tr.

413-15).  Dr. Marceau noted that during the course of the admission, Plaintiff's

medications were adjusted.  (Tr. 414).  By November 24, 2012, Plaintiff denied suicidal or homicidal ideation.  (Tr. 414).  As her stay continued, her affect became brighter, and she reported improvement in both depressive and posttraumatic stress symptoms.  (Tr. 414).  On November 27, 2012, she endorsed continued improvement.  (Tr. 414).  Her affect was broader; she continued to deny suicidal ideation; and she felt ready for discharge.  (Tr. 414).  Diagnoses included bipolar disorder type 2, depressed; PTSD; alcohol dependence; relationship issues; past abuse issues; muscle spasms in the neck; substance abuse issues; chronic mental health issues; and a GAF of 45-50.  (Tr. 414).

### 7.    Psychiatric Review Technique: John Rohar, Ph.D.

On November 7, 2012, Dr. Rohar reviewed Plaintiff's medical records and completed a psychiatric review technique and mental residual functional capacity assessment.  (Tr. 150-56).  At the time of his review the following records were available: 1) a consultative evaluation dated November 1, 2012, from Williamsport Psych Association; 2) records from White Deer Run of Williamsport; 3) records from Lycoming-Clinton MH/MR; 4) records from West Branch Drug and Alcohol; 5) Laurel Behavioral Health; records from Susquehanna Health Systems; and, 6) Records from SHMG Lung Center.  (Tr. 150-52, 157).

Dr. Rohar noted that Plaintiff had a history of alcohol abuse, depression, PTSD, anxiety, and a recent suicide attempt.  (Tr. 153).  Dr. Rohar noted: 1) Dr.

Kelsey's November 2012 consultative psychological evaluation (Tr. 384-93) where Dr. Kelsey observed that Plaintiff was alert and oriented times three, had poor hygiene, depressed mood, normal stream of thought, significant social avoidance, and a poor fund of information; 2) a treatment record dated October 18, 2012, indicating that Plaintiff had been in treatment since September 2012 and was scheduled for therapy once a week; 3) a physical evaluation dated September 26, 2012, noting that Plaintiff's neck, heart, and lung were normal, that Plaintiff was anxious and tearful, avoiding eye contact, constantly wringing hands, and that her speech patterns and thought processes were "OK"; 4) a referral for substance abuse treatment dated September 25, 2012; 5)   inpatient psychiatric treatment from September 16, 2012, to September 21, 2012, following a suicide attempt; and 6) an emergency department record dated September 16, 2012, regarding Plaintiff's suicide attempt and noting depression and an ankle injury.  (Tr. 153).

Dr. Rohar opined that Plaintiff had: 1) no episodes of decompensation, each of extended duration; 2) a mild restriction of activities of daily living (ADLs); and 3) moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace.  (Tr. 153).   Dr. Rohar explained that Dr. Kelsey's November 2012 consultative evaluation relied heavily on the subjective report of Plaintiff.  (Tr. 155).  Dr. Rohar opined that Plaintiff could perform simple, routine, repetitive work in a stable environment, did not have any memory

limitations, was capable of asking simple questions and accepting instruction, and function in production oriented jobs requiring little independent decision making. (Tr. 155-57).  Dr. Rohan opined that Plaintiff was not significantly limited in the ability to: 1) carry out very short and simple instructions; 2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 3) sustain an ordinary routine without special supervision; 4) ask simple questions or request assistance; 5) be aware of normal hazards and take appropriate precautions; 6) set realistic goals or make plans independently of others.  (Tr. 156-57).

Dr. Rohan also opined that Plaintiff was moderately limited in the ability to: 1) carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) work in coordination with or in proximity to others without being distracted by them; 4) make simple work-related decisions; 5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 6) ask simple questions or request assistance; 7) accept instructions and respond appropriately to criticism from supervisors; 8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 9) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 10) respond appropriately to changes in the

work setting; and, 11) travel in unfamiliar places or use public transportation.  (Tr.

155-57).  In support for his conclusions Dr. Rohar explained:

> The limitations resulting from the impairment do not preclude
> [Plaintiff] from performing the basic mental demands of competitive
> work on a sustained basis. . . . The residual functional capacity
> assessment is different than the opinions expressed [in Dr. Kelsey's
> November 2012 report] due to inconsistencies with the totality of the
> evidence in file. Some of the opinions cited in the report are viewed as
> an overestimate of the severity of [Plaintiff's] functional restrictions.
> The examining source statements in the report concerning [Plaintiff's]
> abilities in the areas of making performance adjustments and making
> personal and social adjustments are not consistent with all of the
> medical and non-medical evidence in the claims folder. It appears that
> the examining psychologist relied heavily on the subjective report of
> symptoms and limitations provided by [Plaintiff]. However, the
> totality of the evidence does not support [Plaintiff's] subjective
> complaints. The opinion provided by the examining source is based
> on a brief clinical encounter. . . .  Therefore, great weight cannot be
> given to the examining source's opinion.

(Tr. 157).

## 8.      Consultative Evaluation: John W. Kelsey, Ph.D.

On November 1, 2012, Plaintiff was evaluated by Dr. Kelsey.  (Tr. 384-95).

Dr. Kelsey observed that Plaintiff arrived to the evaluation by walking and was

capable of completing her personal history in detail.  (Tr. 384).  Dr. Kelsey noted

that he had previously evaluated Plaintiff for the Bureau of Disability on March 21,

2007, and the report was available.   When Plaintiff was asked to update all

historical information since 2007 "it became clear that while there was significant

problems diagnosed in 2007, statements [Plaintiff] gives today suggests that there

was information withheld in 2007, which was significant for making an accurate diagnosis." (Tr. 384).  Dr. Kelsey noted that Plaintiff:

> has had a long-term history of alcohol abuse and is being treated for that at this time. She notes that she made some form of suicidal gesture on September 16, 2012 and was hospitalized at Soldiers and Sailors Memorial Hospital under the care of Clifford Weller, D.O., psychiatrist. Accompanying this request for evaluation is Dr. Weller's discharge on September 21, 2012 and the discharge diagnosis was depressive disorder, NOS; alcohol intoxication, resolved; and alcohol abuse. Significant lacerations were noted on her wrist and forearms bilaterally and there was significant alcohol withdrawal syndrome while hospitalized.
>
> [Plaintiff] was referred to West Branch Drug and Alcohol Facility, where she apparently was then referred to the White Deer Run Drug and Alcohol outpatient program. She sees someone there by the name of Melanie . . . [Plaintiff] admits that she is going to White Deer for "alcohol abuse." Apparently, she has also gone to the Meadows Outpatient Clinic on October 25, 2012 and seen somebody by the name of "Tammy." This is some form of psychiatric medication follow up and [Plaintiff] claims that she is being referred to Dr. Keonari who is a psychiatrist in Centre Hall, Pennsylvania. Appointment is not until December 11th or 12th. Primary care physician has apparently continued medications. Referring back to Dr. Weller's report, there was an indication that she had been placed on Neurontin and Celexa at that time. She was advised to "strongly advised to continue to avoid alcohol at all costs." Trazodone was also provided for sleeping. [Plaintiff] indicates that presently her medications are Celexa 40 mg once a day, gabapentin 900 mg three times a day, trazodone 50 mg one and a half per day, Wellbutrin 150 mg once a day, and hydroxyzine 25 mg two every six hours.

(Tr. 385).

Dr. Kelsey reviewed his 2007 evaluation (Tr. 469-76) and noted that "there was an indication that [Plaintiff] had seen [a psychiatrist] in 1997 for one session . .

. but she 'never went back.'" (Tr. 385). There were records that her primary care physician had been prescribing Paxil 40 mg once a day and she had been on the medication for "'10 or 11 years.'" (Tr. 385-86). Plaintiff reported a "long history of failed employment" stating that she had been fired or quit twenty or thirty times over the years. (Tr. 387). Plaintiff reported that from 2009 to 2012, she had worked as a caregiver until she was fired when she was psychiatrically hospitalized. (Tr. 387).

Plaintiff reported that she worked on and off providing different in-home care services. (Tr. 387). Plaintiff reported that in 2012 for six months she was a housekeeper at a motel until she was fired, in 2011 she worked as a caregiver for a few weeks until she was fired, and in 2010 she worked as a laborer for five months but quit because her male co-workers were "'under Megan's Law and that made [her] uncomfortable.'" (Tr. 387). Plaintiff also reported that in 2009 she worked a few months of in-home care, but was fired after she was found to be sexually engaged with the person's son with whom she was providing care. (Tr. 387). Plaintiff stated that in 2008 or 2009, she was a laborer for one month until she was fired, in 2006 she worked as a laborer until she quit, in 2004 worked for a month through a temporary service agency, in 2003 she worked for two months doing in-home care before she quit, and she worked as a caregiver for nine months in 2001 until she quit because she couldn't concentrate. (Tr. 387). When asked about her

current income, Plaintiff reported that while she had no cash, she received some financial support from her live-in boyfriend for the past seven years and his grand-uncle. (Tr. 387). Plaintiff also stated that she has a medical card and food stamps. (Tr. 387). Plaintiff reported that she spends three hours a day watching TV and does not read because she does not remember what she reads. (Tr. 388).

Plaintiff reported that she liked to spend time with her grandchildren and that she does not have any friends. (Tr. 388). Plaintiff stated that she does not have a driver's license because of anxiety. (Tr. 388). Plaintiff reported that she can cook normal meals and her grown daughter usually accompanies her for grocery shopping. (Tr. 388). With regards to cleaning, Plaintiff responded that she does not finish what she starts. Dr. Kelsey noted that:

> Different from her report in 2007, there is a claim that she has been drinking significantly for the past 29 years. She claims that she last had alcohol 46 days ago. She claims that she was drinking at least four times a week, generally a 6 to a 12-pack of "pounders." She notes that this would frequently get her drunk and she states that she had difficulties with blacking out. . . . In 2002, she was arrested and convicted of disorderly conduct with assault. She spent no time in jail, but was on a one-year probation and fined.

(Tr. 388). Upon examination Dr. Kelsey observed that Plaintiff's clothes were "somewhat filthy and unwashed," her forearms and wrists revealed "at least 10, one inch to 2 inch long cuts running horizontally up her right forearm and at least one 2 inch cut on her left wrist." (Tr. 388). Dr. Kelsey observed that there was some mild psychomotor retardation and that Plaintiff's gait and pace were slow.

(Tr. 389).  Dr. Kelsey observed that Plaintiff's speech was appropriate for content and continuity, her stream of thought had normal continuity and productivity, she was never incoherent or incomprehensible, and her mood was "clearly depressed." (Tr. 389).  Plaintiff reported that she had been depressed for years, and "clearly seem[ed] to indicate that she was self-medicating by using alcohol for many years and that in fact the depression signs have increased since her sobriety 46 days ago." (Tr. 389).

Dr. Kelsey noted that Plaintiff reported a history which demonstrated "significant social avoidance" and she "claim[ed] posttraumatic stress disorder-like symptoms" which stemmed, in part to cleaning up the bodily fluids of her deceased brother a month and a half ago.  (Tr. 389).  Dr. Kelsey noted that Plaintiff's cognitive ability "appear[ed] to be problematic" even with her poor education and in his previous 2007 examination he opined that she was "likely to function at the borderline range, but there [was] no formal testing available."  (Tr. 390).  Dr. Kelsey elaborated:

> At today's evaluation, she did know that 6x6 was 36, but thought that $18-$7.50 cents was $11.50. She did know that 5x5 was 25. She thought that there were 34 weeks in a year. She thought that the President of the United States was during the Civil War was "Columbus." She thought that the capital of Pennsylvania was "the United States." She did know that Paris was the capital of France, but did not know who wrote Romeo and Juliet. On paired associates, she correctly identified that an apple and a banana were alike in that they are fruit, a dog and a lion are animals, an eye and an ear are senses, and a boat and an automobile are transportation. When asked what the

saying 'strike while the iron is hot' means, she indicated, "do something while it's there."

(Tr. 390).   Dr. Kelsey observed that throughout the evaluation, Plaintiff was oriented to time, place, and person and conversational memory was within normal limits and clearly remote memory was well correlated with information documented in 2007.  (Tr. 390).

Dr. Kelsey observed that on "immediate retention and recall, she was able to demonstrate six digits forward and four digits backwards for a short-term memory score in the low average range," "judgment and insight appears to be poor," and "[t]est judgment is also problematic."  (Tr. 390).  Dr. Kelsey opined that it would "be hard to differentiate major depression from posttraumatic stress disorder," and recommended that treatment focus on major depression as well as alcoholism.  (Tr. 391).  Dr. Kelsey opined that Plaintiff had  poor intellectual functioning, and poor fund of information and educational achievement.  (Tr. 391).

Dr. Kelsey opined that Plaintiff's prognosis would "likely to be poor over the next year given what is now clearly chronic history of mental illness, alcoholism, and distorted personality."  (Tr. 391).  Dr. Kelsey opined that Plaintiff appeared to be "only marginally capable of managing funds in a competent manner on her own behalf at this time and this [could possibly] deteriorate dramatically if the major depressive symptoms continue."  (Tr. 391).  Dr. Kelsey assessed Plaintiff with: chronic alcohol dependence; major depressive disorder, single episode, and;

rule out chronic posttraumatic stress disorder. (Tr. 391). Dr. Kelsey also assessed Plaintiff with personality disorder, NOS includes avoidant, dependent, and borderline features, and he suggested a rule out diagnosis of borderline intellectual functioning. (Tr. 391).

Dr. Kelsey completed a questionnaire opining that Plaintiff had no or a slight limitation in the ability to: 1) Understand and remember short, simple, instructions; 2) Carry out short, simple instructions; and, 3) understand and remember detailed instructions. (Tr. 392). Dr. Kelsey also opined that Plaintiff had a moderate or marked limitation in the ability to: 1) carry out detailed instructions; 2) make judgments on simple work-related decisions; 3) interact appropriately with the public; 4) interact appropriately with supervisor (s) and co-workers; 5) respond appropriately to work pressures in a usual work setting; and, 6) respond appropriately to changes in a routine work setting. (Tr. 392). Dr. Kelsey added that Plaintiff was clearly self-medicating with alcohol and noted that since stopping alcohol in the past month, Plaintiff reported a significant increase in depression, anxiety, and thoughts associated with past events. (Tr. 393).

### 9.    Psychiatric Assessment: Karen Peterman, N.P.

On October 8, 2013, Ms. Peterman completed a psychiatric questionnaire. (Tr. 478-79). Ms. Peterman checked boxes indicating that Plaintiff experienced: 1) anhedonia or pervasive loss of interest in almost all activities; 2) appetite

disturbance with change in weigh; 3) sleep disturbance; 4) psychomotor agitation or retardation; 5) feelings of guilt or worthlessness; and, 6) difficulty concentrating or thinking.  (Tr. 478).  Ms. Peterman indicated that Plaintiff had a moderate restriction on activities of daily living, moderate difficulty in maintaining concentration, persistence, or pace, and marked difficulty in maintaining social functioning.  (Tr. 478).

Ms. Peterman check boxes indicating that Plaintiff had: 1) repeated episodes of decompensation, each of extended duration; 2) medically documented history of a chronic affective disorder of at last 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support.; 3) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; and, 4) current history of one or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  (Tr. 478).  Ms. Peterman also indicated that Plaintiff would require unscheduled breaks during an eight-hour work day and would likely experience absenteeism due to her medical condition in excess of two days per month.  (Tr. 479).

### 10.    Pennsylvania Department of Public Welfare Employability Assessment Form: Clifford Weller, D.O.

While Plaintiff was hospitalized, Dr. Weller completed an employability assessment.  (Tr. 494).  In an employability form dated September 18, 2012, Dr. Weller opined that Plaintiff was temporarily disabled for a period from September 1, 2012 to June 30, 2013.  (Tr. 494).  Dr. Weller assessed Plaintiff with major depression disorder based upon a physical examination, review of medical records, clinical history and tests.  (Tr. 494).

### 11.  Testimony

During the hearing, the ALJ asked if Plaintiff understood that in order to collect unemployment compensation benefits she had to certify that she was able and available to work, to which Plaintiff responded in the affirmative.  (Tr. 125). Plaintiff testified that she was willing to work if she could find a job within her limitation.  (Tr. 125).  When asked what kind of jobs she thought she would have been able to do she responded that she did not know because she did not obtain any job, "[i]t's just no one called."  (Tr. 125-26).  Plaintiff testified that she applied to "probably four" jobs over the last year as she was receiving unemployment benefits.  (Tr. 126).  Plaintiff testified that in the past she stopped working one job due to her psychiatric hospitalization, another job she stopped working because climbing up five flights of stairs with heavy bags hurt her back, and another job she said she thought she was laid-off because they wanted a registered nurse.  (Tr. 126-127).  Plaintiff explained that she had lost twenty jobs due to her anxiety and

inability to focus on her work, listening to supervisors, finishing tasks, and due to her failure to show up at work.  (Tr. 128).  When asked whether her alcohol dependence played a role in her inability to maintain employment, Plaintiff responded "Back then when I was in my 20's, late 20's early 30's but I haven't drank and I plan not drinking. I'm trying to deal with what I have now. That's hard enough."  (Tr. 128).  When asked if she had been drinking regularly until April 2013, Plaintiff testified that it had been "on and off."  (Tr. 129).  Plaintiff also testified that she had not participated in any alcohol counseling since the prior year and insisted that to attend AA meetings she needed to have medical insurance.  (Tr. 130-31).

## III.   Legal Standards and Plaintiff's Alleged Errors

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof.  The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  The ultimate burden of proving disability under the Act lies with the claimant.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

With due deference to the Commissioner's interpretation of social security rulings and regulations, the court may reverse the Commissioner's final determination if the ALJ did not properly apply the legal standards.  *See* 42 U.S.C.

§ 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (deference to agency interpretation of its own regulations); *Sanfilippo v. Barnhart*, 325 F.3d 391, 393 (3d Cir. 2003) (plenary review of legal questions in social security cases); *see also Witkowski v. Colvin*, 999 F. Supp. 2d 764, 772-73 (M.D. Pa. 2014) (citing *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007)).   The court may also reverse the Commissioner if substantial evidence does not support the ALJ's decision.   *See* 42 U.S.C. § 405(g); *see also Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986).   Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).   Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## A. Plaintiff's Credibility

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility based on Plaintiff's sporadic work history, working after alleged onset date of disability, and her receipt of unemployment benefits.  Pl. Brief at 11-12.

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p.  An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony.  Social Security Ruling ("SSR")[3] 96-7p; *Schaudeck v. Comm'r of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999).   The credibility finding must be based on a consideration of the entire case record.  SSR 96-7p.  Evidence can be used to discount credibility if such evidence demonstrates a contradiction or inconsistency. *See e.g. Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 188 (3d Cir. 2007) (finding significant a plaintiff's testimony about her daily activities was internally inconsistent, thus supporting the ALJ's determination of according her testimony little weight); *Smith v. Astrue*, 359 F. App'x 313, 317 (3d Cir. 2009) (claimant's

---

[3] Although SSA rulings do not have the force and effect of a statute or regulation, they are binding on all components of the SSA in accordance with section 402.35(b)(1) of the SSA Regulations (20 C.F.R. § 402), and are to be relied upon as precedents in adjudicating other cases.

testimony that she was essentially bedridden contradicted by evidence that she had been primary caretaker for small child for two years).

Substantial evidence supports the ALJ's credibility determination.   In a November 2012 evaluation with Dr. Kelsey, Plaintiff reported non-disability reasons that she discontinued working.  (Tr. 387).  Plaintiff reported that in 2010 she quit because there were male wo-workers who were "under Megan's Law and that made [her] uncomfortable'" and in 2009 she was fired after she was found to be sexually engaged with the person's son with whom she was providing care.  (Tr. 387).   The ALJ heard testimony where Plaintiff cited reasons related to an exacerbation of psychiatric symptoms when her brother died in addition to reasons unrelated to her psychiatric limitation or her alleged neck limitation for why her employment was terminated.  (Tr. 125-127).  Plaintiff testified that in the past, she stopped working one job due to her psychiatric hospitalization (which she testified stemmed from the death of her brother and her increase in alcohol consumption), another job she stopped working because climbing up five flights of stairs with heavy bags hurt her back, and another job she said she thought she was laid-off because they wanted a registered nurse.   (Tr. 126-127).   Although Plaintiff explained that she had lost twenty jobs due to her anxiety and inability to focus on her work, listening to supervisors, finishing tasks, and due to her failure to show up at work (Tr. 128), she was evasive regarding her contemporaneous history of

alcohol consumption and whether such contributed to her long history of sporadic job attendance. (Tr. 128-29). Plaintiff also testified that she had not participated in any alcohol counseling since the prior year and insisted that as a prerequisite to attend AA meetings she needed to have medical insurance. (Tr. 130-31).

Under ruling 96-7p, a credibility determination of an individual's statements about pain or other symptoms and about the effect the symptoms can be based on "[s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about . . . prior work record and efforts to work . . . ." SSR 96-7p; *see also Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979) (Work history is a proper consideration in the credibility assessment). The inferences drawn from a claimant's work history vary depending on the facts. *See e.g.*, *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (holding that a claimant's testimony "is entitled to substantial credibility" where the claimant has a lifetime record of continuous work); *Ford v. Barnhart*, 57 F. App'x 984, 988 (3d Cir. 2003) (finding no error where an ALJ made an adverse credibility determination based on erratic pre-onset work history); *Crotsley v. Astrue*, No. CIV. A. 3:10-88, 2011 WL 5026341, at *4 (W.D. Pa. Oct. 21, 2011) (an inference of a lack of motivation to work can be drawn from a sporadic work history prior to disability onset); *Collins v. Astrue*, No. CIV.A. 11-1275, 2012 WL 2930885, at *11 (W.D. Pa. July 18, 2012) (an inference of a lack of motivation to

work can be drawn from a sporadic work history prior to disability onset); *Henderson v. Astrue*, No. CIV.A. 10-1638, 2011 WL 6056896, at *6 (W.D. Pa. Dec. 6, 2011) (post onset part-time work could support a finding of non-disability); *Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989) (sporadic work-history as evidence of mental impairment); *Smith v. Heckler*, 735 F.2d 312, 318 (8th Cir. 1984) (finding error where ALJ determined that a claimant lacked motivation, however, the ALJ failed to address claimant's history of work attempts and testimony which supported that claimant simply lacked basic mental ability to follow directions without constant supervision).

The Court finds that the ALJ adequately noted instances where Plaintiff cited non-disability reasons for the termination of different jobs, the longitudinal picture of Plaintiff's work history, history of alcohol consumption, and receipt of unemployment benefits.  It was permissible for the ALJ to consider Plaintiff's work history, non-health related reasons for stopping work, and motivation to work as factors in determining Plaintiff's credibility.  *See e.g.*, *Hogan v. Apfel*, 239 F.3d 958 (8th Cir. 2001) (The closeness in time of plaintiff's on-the-job reprimand to her ceasing work cast doubt on her assertion that she quit her job because of pain and side effects of her pain medication); *Kane v. Colvin*, No. 3:13-CV-02469, 2015 WL 1513960, at *12 (M.D. Pa. Mar. 31, 2015) (noting that the plaintiff reported she was laid off because there was "not enough work for her," not because she was

unable to work due to disability); *Pachilis v. Barnhart*, 268 F. Supp. 2d 473, 483 (E.D. Pa. 2003) (finding that a claimant incentive or disincentive to work is a permissible criterion bearing on his credibility).

The ALJ summarized medical evidence that indicated Plaintiff experienced a temporary exacerbation of her symptoms due to the death of her brother.  (Tr. 69, 71).  The ALJ reasonably relied on medical expert opinion which evaluated the medical evidence, and concluded that it did not substantiate Plaintiff's claims.  (Tr. 68-69).  *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation.); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof"); 42 U.S.C.A. § 1382c(a)(3)(H)(i).

Plaintiff testified that she received unemployment benefits and understood that in order to collect unemployment compensation benefits she had to certify that she was able and available to work and that she was willing to work if she could find a job within her limitation.  (Tr. 125).  Contrary to Plaintiff's argument suggesting that Plaintiff intended the possibility of seeking part-time employment, Plaintiff never indicated that her intention was to work only part-time when inquired during the hearing.  (Tr. 125-26).  When asked what kind of jobs she thought she would have been able to perform, she responded that she did not know

because she did not obtain any job, "[i]t's just no one called." (Tr. 125-26). Plaintiff testified that she applied to "probably four" jobs over the last year as she was receiving unemployment benefits.[4] (Tr. 126). Receipt of unemployment, although not determinative alone, may be considered by the ALJ. *See Myers v. Barnhart*, 57 F. App'x 990, 997 (3d Cir. 2003) (It is "entirely proper for the ALJ to consider that [Plaintiff's] receipt of unemployment benefits was inconsistent with a claim of disability during the same period"); *Burnside v. Colvin*, No. 3:13-CV-2554, 2015 WL 268791, at *17 (M.D. Pa. Jan. 21, 2015) (discussing authority from different circuits).

With regards to Plaintiff's argument that the ALJ erred in considering Plaintiff's work after the alleged onset date, under 20 C.F.R. §§ 404.1571, 416.971, a claimant's ability to work a more demanding job temporarily may constitute probative evidence of his or her ability to perform the duties of a less demanding full-time job. *See* 20 C.F.R. §§ 404.1571, 416.971; *see also Forster v. Colvin*, No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *7 (M.D. Pa. Apr. 10, 2015); *Henderson v. Astrue*, No. CIV.A. 10-1638, 2011 WL 6056896, at *6 (W.D. Pa. Dec. 6, 2011); *Lyons v. Heckler*, 638 F. Supp. 706, 711 (E.D. Pa. 1986) ("If a

---

[4] The Court notes that an individual is ineligible for compensation for any week "'[i]n which his unemployment is due to failure, without good cause . . . to apply for suitable work at such time and in such manner as the department may prescribe . . . .'" *Murphy Marine Servs., Inc. v. Unemployment Comp. Bd. of Review*, No. 2232 C.D. 2013, 2014 WL 3812329, at *3 (Pa. Comm. Ct. Aug. 4, 2014).

claimant performs work during any period in which she alleges that she was disabled, the work performed may demonstrate that she is able to engage in substantial gainful activity"); *Lauer v. Bowen*, 818 F.2d 636, 641-43 (7th Cir. 1987) (J. Posner dissent) (explaining that past "insubstantial" work in combination with other evidence can support a conclusion that a claimant is not disabled). Sections 404.1571 and 416.971 provide that "[e]ven if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."   20 C.F.R. §§ 404.1571, 416.971.   The ALJ did not err in considering that Plaintiff's ability to work for a short time in a more demanding job than described in the RFC would support an inference that Plaintiff could sustain work that accommodated greater limitations that are included in the RFC.

The ALJ discussed the material evidence throughout his decision and based on the foregoing, substantial evidence supports the ALJ's credibility determination. *See* SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929.

## B. Step Three Non-Severe Impairments

Plaintiff argues that the ALJ erred in concluding that Plaintiff's "cervical pathology" was not a severe impairment.  Pl. Brief at 12-14.  Plaintiff argues: "Anyone who has had a persistent muscle spasm, particularly one in the neck, would probably endorse the view that this is a severe impairment. It is an

impairment that could create the need for unscheduled breaks and excessive absenteeism from work." Pl. Brief at 13.  This argument lacks merit.

At step two of the five-step sequential inquiry, the ALJ must determine whether the claimant has a medically severe impairment or combination of impairments.  *See Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).  An impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities," *i.e.*, physical abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, or mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b); 416.921(b).

A "severe" impairment is distinguished from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of the claimant's age, education, or work experience.  *See Bowen*, 482 U.S. at 149-51.  The claimant has the burden of showing that an impairment is severe.  *Bowen*, 482 U.S. at 146 n. 5.  Moreover, objective medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope

with the mental demands of working.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007).

If a claimant has any severe impairment, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g), 416.920(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two and all impairments are considered at step four when setting the residual functional capacity.  *See* 20 C.F.R. §§ 404.1523, 416.923 and 404.1545(a)(2), § 416.945(a)(2); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *Shannon v. Astrue*, No. 4:11-CV-00289, 2012 WL 1205816, at *10-11 (M.D. Pa. Apr. 11, 2012); *Bell v. Colvin*, No. 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013).

In considering the impact of an alleged impairment, the adjudicator may rely on the judgment of a physician who has examined the claimant, reviewed the medical records and opined as to what Plaintiff is able to do notwithstanding the alleged impairment.  *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation); 20 C.F.R. § 1545(a)(1) (a residual functional capacity is "the most [a claimant] can do despite [their] limitations").  Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the impairment.  *See*

*Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom.*
*Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *accord*, *Walker v.*
*Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006).

Records indicate that in September 2012 and October 2012 Plaintiff had full
range of motion in her neck and denied any neck pain. (Tr. 312, 354, 356, 544).
On November 15, 2012, Plaintiff was assessed with an anxiety reaction and spasms
in the neck and upper back and prescribed medication. (Tr. 477). In a record from
her primary physician, on November 20, 2012, Plaintiff reported continued neck
pain, that the medication was not helping, and that the neck pain and spasms were
causing her headaches and exacerbating her psychological symptoms. (Tr. 536).
Plaintiff's neck demonstrated a decreased range of motion with flexion, extension,
and rotation in either direction. (Tr. 537). Plaintiff was treated with injections and
narcotics. (Tr. 538). In hospital record also dated November 20, 2012, Plaintiff
reported having "some problems with neck pain . . . for about the last week,
associated with her anxiety" and it was noted that she also "gets significant spasms
in her upper back, although this is associated with her anxiety." (Tr. 416-17). A
physical examination of her neck demonstrated a full range of motion of the neck.
(Tr. 418). Then on January 24, 2013, examination revealed that Plaintiff had full
range of motion in her neck. (Tr. 531).

There appears to be a gap in treatment from March 2013 to September 2013, which Plaintiff explained was due to a lack of medical insurance.  (Tr. 118, 130-31, 137).  Then on October 24, 2013, Plaintiff reported muscle spasms in her neck with pain that radiated to her upper shoulder, lateral neck and head.  (Tr. 517).  It was noted that Plaintiff had decreased flexion, extension, rotation due to discomfort.  (Tr. 519).  Plaintiff was prescribed medication to address the muscle spasms.  (Tr. 519).  In another record dated October 24, 2013, Dr. France concluded that X-ray imaging revealed "reversal of normal curvature and subluxations as well as mild anterior narrowing of the C5-C6 disc" and stated that "[t]hese changes are probably all secondary to paraspinal muscle spasm or splinting, though this is speculative."  (Tr. 555).  On November 3, 2013, Plaintiff sought treatment for neck pain and was prescribed medications.  (Tr. 485).

Although Plaintiff asserts experiencing a debilitating cervical impairment, substantial evidence from medical records demonstrating full range of motion in the neck, conservative treatment, and Plaintiff's ability to engage in ADLs supports the ALJ's finding that Plaintiff does not have a disabling condition as a result of a cervical impairment.  Moreover, Plaintiff fails to direct the Court to any medical opinion from a physician concluding that notwithstanding treatment, Plaintiff would still be unable to work on a sustained basis.  Plaintiff did not meet her

burden of showing that her cervical impairment was severe. *Bowen*, 482 U.S. at 146 n. 5.

## C. Weight Accorded to Medical Opinions

Plaintiff argues that the ALJ failed to accord sufficient weight to: Plaintiff's low GAF scores; the opinion of the consulting psychologist, Dr. Kelsey; a form opinion completed by Dr. Weller during one of Plaintiff's psychiatric hospitalizations, and; an opinion from a nurse practitioner, Ms. Peterman. Pl. Brief at 6-7. Plaintiff also argues that the ALJ accorded too much weight to the November 2012 non-examining opinion of Dr. Rohar. Pl. Brief at 8.

For weighing all medical opinions, the Commissioner considers the factors enumerated in 20 C.F.R. §§ 404.1527(c), 416.927(c). Pursuant to subsection (c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Pursuant to subsection (c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Pursuant to subsection (c)(5), more weight may be assigned to specialists, and subsection (c)(6) allows consideration of other factors which "tend to support or contradict the opinion." 20 C.F.R. §§ 404.1527(c), 416.927(c).

When a physician's opinion is based on subjective, rather than objective, information, and the ALJ has properly found a claimant's subjective claims to be less than fully credible, an ALJ may assign less weight to the opinion:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) ("The ALJ thus disregarded [the doctor's] opinion because it was premised on Fair's own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.").

*Morris v. Barnhart*, 78 Fed. Appx. 820, 824-25 (3d Cir. 2003) (some internal citations omitted).  In this instance, the ALJ explained that:

> [Plaintiff] treats only through her primary care provider and is prescribed medications. Beyond her subjective reports of anxiety and depressive symptoms, there is little in clinical findings on examination to support her alleged debilitating symptoms and she is only seeing a nurse practitioner at Community Health. One would expect that someone with such debilitating mental problems as alleged by claimant would exhibit objective findings of such limitations that would be observable and included consistently in the examination findings. One would also expect that such a person would require treatment that is more intensive, or at least be referred for such treatment. The record is devoid of such evidence here.

(Tr. 72).  The ALJ's consideration of Plaintiff's conservative treating is a proper ground for finding Plaintiff's allegations less credible.  *See* Social Security Ruling ("SSR") 96-7p ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . and there are

no good reasons for this failure)."   While there was a seventh-month gap in treatment from March 2013 to September 2013 and Plaintiff testified that she did not have medical insurance for a period of time, Plaintiff never consistently sought therapy and more intensive treatment was not recommended by her primary care physician even when she was getting prescriptions and treatment for other purported ailments.

Substantial evidence supports the ALJ's reliance on the November 2012 opinion of Dr. Rohar and according less weight to the low GAF scores and the opinions of Dr. Kelsey, Dr. Weller, and Ms. Peterman.

## 1.   Weight of GAF Scores

To the extent that Plaintiff argues that the ALJ did not afford proper weight to the low GAF scores surround her exacerbation of symptoms and hospitalizations, such argument is unpersuasive.[5]   In *Gilroy v. Astrue*, the Third Circuit held that remand was not required where the ALJ did not reference a GAF

---

[5] The Court notes that "[d]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual [of Mental Disorders] ("DSM–5")."   *Solock ex rel. F.A.R.P. v. Astrue*, No. 1:12-CV-1118, 2014 WL 2738632, at *6 (M.D. Pa. June 17, 2014) (citing Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders 5d*, 16 (2013)).   "It was recommended that the GAF be dropped from DSM–5 for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice."   *See* Am. Psychiatric Ass'n, Diagnostic and Stat. Manual of Mental Disorders, DSM–516 (5th ed. 2013).   In response, the Social Security Administration now allows ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental impairments; however, a "GAF score is never dispositive of impairment severity," and thus an ALJ should not "give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence."   SSA AM-13066 at 5 (July 13, 2013).

score of 45 assigned by the treating psychiatrist where the ALJ did refer to observations from the psychiatrist's reports and where the psychiatrist did not explain the basis for the GAF score. *See Gilroy v. Astrue*, 351 F. App'x 714, 715-16 (3d Cir. 2009). Moreover, because "the GAF scale does not directly correlate to the severity requirements in the mental disorders listings, a GAF score should be considered with all of the evidence but it is not dispositive." *Galvin v. Comm'r of Soc. Sec.*, No. CIV.A.08-1317, 2009 WL 2177216, at *1 n.5 (W.D. Pa. July 22, 2009); *see also* 66 Fed. Reg. 50764–5 (2000). The ALJ addressed the low GAF scores in context of a temporary exacerbation of symptoms and substantial evidence supported the ALJ concluding that the low GAF scores did noy demonstrate that Plaintiff was unable to work on a sustained basis.

### 2.    Weight of Dr. Kelsey's Opinion

For the weight allocated to Dr. Kelsey, the ALJ explained that the severity of limitations opined by Dr. Kelsey was not consistent with the overall clinical picture or his observations during the consultative examination. (Tr. 72). The ALJ added that the opinion was based upon "a one-time snapshot of [Plaintiff's] mood and behavior, which relie[d] heavily on [Plaintiff's] subjective complaints." (Tr. 72-73). The ALJ noted that Dr. Kelsey's opinion dated November 1, 2012, was during a period of time when she was experiencing an exacerbation in symptoms and was a few weeks before her psychiatric hospitalization on November 20, 2012

(Tr. 413).  (Tr. 70 (noting that "[t]his exam occurred in between her two hospitalizations in September/November 2012.")).  It was also reasonable for the ALJ to rely on the opinion of Dr. Rohar who explained that Dr. Kelsey's November 2012 consultative evaluation was not persuasive since it relied heavily on the subjective report of Plaintiff.  (Tr. 155).  Substantial evidence supported the ALJ's according greater weight to the opinion of Dr. Rohar over that of Dr. Kelsey.  *See Morris v. Barnhart*, 78 Fed. Appx. 820, 824-25 (3d Cir. 2003).

### 3.    Weight of Dr. Weller's Opinion

With regard to Dr. Weller's opinion, the Court notes that Dr. Weller's opinion does not support Plaintiff's claim for disability.  Notwithstanding the severity of symptoms presented prior and during the psychiatric hospitalization, Dr. Weller still opined that Plaintiff's condition did not meet the durational requirement for disability.  (Tr. 494).[6]

### 4.    Weight to Ms. Peterman's Opinion

For the weight allocated to Ms. Peterman's opinion, the Court notes that she is not an acceptable medical source.  *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  "Medical opinions are statements from . . . *acceptable medical*

---

[6] The Court agrees with Plaintiff that the ALJ provided an erroneous reason for discrediting the opinion of Dr. Weller based on the ALJ's belief that there is an innate bias of treating physicians. However, in light of the other proffered reason that the form-opinion did not require Dr. Weller to justify his opinions through objective medical findings, diagnostic test results or other competent evidence, in addition to the little probative value of the opinion, the Court finds the error harmless.  *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir.2005).

*sources* that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . .symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (emphasis added). Only licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are considered "acceptable medical sources." *See* 20 C.F.R. §§ 404.1513(a) & 416.913(a). Evidence from "other sources" that are not "acceptable medical sources" and are not entitled controlling weight. *See* 20 C.F.R. §§ 404.1513(a) and (d)(1), 404.1527(a)(2), 416.913(a) and (d)(1), 416.927(a)(2); Social Security Ruling (SSR) 96-2p (rule for according controlling weight to "treating source medical opinions"); SSR 06-03p; *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir. 1999); *cf. Gomez v. Chater*,74 F.3d 967, 970-71 (9th Cir. 1996) (Opinions from "other sources" can be accorded "less weight than opinions from acceptable medical sources").

Nurse practitioners are not acceptable medical sources. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a); *Hartranft v. Apfel*, 181 F.3d 358, 361; *Hearn v. Colvin*, No. 3:13-CV-1229, 2014 WL 4793954, at *10-11 (M.D. Pa. Sept. 24, 2014). Nevertheless, opinions from other medical sources should be considered by the ALJ in the decision's overall findings, specifically with respect to issues such as

the severity of impairments and functional effects.  *See* 20 CFR 404.1527(b) and 416.927(b); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121-23 (3d Cir. 2000); SSR 06-03p ("The term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources'").  Although "other source" opinions can, under certain limited circumstances, outweigh the opinion from a medical source, the ALJ need only consider evidence from such other sources with the available evidence as a whole.  *See* 20 CFR 404.1527(b) and 416.927(b); SSR 06-03p.

An ALJ may properly allocate greater weight to the consultative opinion of a non-examining physician who reviews a claimant's medical records over opinion from non-acceptable medical sources, provided that the ALJ adequately explains the grounds for this determination. *See e.g.*, *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir.1999); *Gomez v. Chater*, 74 F.3d 967, 970–71 (9th Cir. 1996).

In this instance, presented with contrasting opinions from a non-examining physician and a treating health professional who was not an acceptable medical source, the ALJ compared these opinions against the objective medical evidence, including Plaintiff's own testimony.  That assessment led the ALJ to conclude that the consulting state physician's review more aptly captured Plaintiff's residual functional capacity, an assessment which was supported by substantial evidence in the record.  Since Ms. Peterman's opinion was not entitled to controlling weight as

a matter of law, and the ALJ's opinion adequately explained the grounds for affording greater weight to the non-examining doctor's opinion, remand is not warranted. *See Hearn v. Colvin*, No. 3:13-CV-1229, 2014 WL 4793954, at *10-11 (M.D. Pa. Sept. 24, 2014).

### 5.      Weight to Dr. Rohar's Opinion

The ALJ explained that Dr. Rohar's assessment was well-reasoned and consistent with the longitudinal record when considered in its entirety. (Tr. 72). The Court notes that Dr. Rohar reviewed materially relevant records which included Dr. Kelsey's November 2012 assessment, Dr. Weller's assessment from Laurel Behavioral Health, psychiatric hospitalization records, Plaintiff's self-report, and other medical records. (Tr. 150-52, 157).

Dr. Rohar noted where an October 2012 record indicated that she started once-a-week therapy in September 2012 and concluded that she had no episodes of decompensation, each of extended duration. (Tr. 153). Dr. Rohar explained that Dr. Kelsey's November 2012 consultative evaluation relied heavily on the subjective report of Plaintiff. (Tr. 155). In support for his conclusions, Dr. Rohar explained that his assessment differed from Dr. Kelsey's "due to inconsistencies with the totality of the evidence in file," "based on a brief clinical encounter," and opined that some of the Dr. Kelsey's opinions "overestimate[d] of the severity of

[Plaintiff's] functional restrictions." (Tr. 157). Given the extent of the medical records reviewed by Dr. Rohar and his explanation for his opinion, substantial evidence supports the ALJ's allocation of great weight to Dr. Rohar's opinion.

Based on the foregoing, substantial evidence supports the ALJ's allocation of greater weight to Dr. Rohar's opinion over the opinions of Dr. Kelsey, Dr. Weller, and Ms. Peterman.

### D. Sentence Six

Plaintiff argues that the "Appeals Council erred in failing to consider new evidence relating to Plaintiff's condition at the time of hearing." Pl. Brief at 14-15.

When the Appeals Council denies review, evidence that was not before the ALJ may only be used to determine whether it provides a basis for remand under sentence six of section 405(g), 42 U.S.C. ("Sentence Six"). *See Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). Sentence Six requires a remand when evidence is "new" and "material," but only if the claimant demonstrated "good cause" for not having incorporated the evidence into the administrative record. *Id.* "[T]the official record closes once the administrative law judge issues his or her decision." 20 C.F.R. §§ 405.360; 405.430. The relevant time period is "the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); *Mathews*, 239 F.3d at 592.

The Court notes that the Plaintiff submits medical records with a new diagnosis of spasmodic torticollis dated December 30, 2014, and an opinion dated January 20, 2015, (Tr. 10, 13), which were generated over a year after the ALJ's decision dated December 2, 2013.  The Court notes that the January 2015 opinion is not a retrospective opinion.  Plaintiff has failed in her burden to demonstrate that these records are material to the relevant time period considered by the ALJ at the time of the December 2013 decision rather than a deterioration of symptoms subsequent to the December 2013 decision.  Plaintiff has not demonstrated good cause, for failing to obtain the medical opinion prior to the ALJ decision regarding the alleged neck impairment and remand is not warranted for the ALJ to consider the new evidence.  *See Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001) (holding that there was no good cause for the omission of an opinion created after the ALJ decision when the opinion could have been created before the ALJ decision).

## IV.      Recommendation

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions

of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: September 13, 2016                    s/Gerald B. Cohn

                                    GERALD B. COHN

                                    UNITED STATES MAGISTRATE JUDGE